IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01121–EWN

DAVID V. COLBY,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

    This is a social security benefits appeal.  Plaintiff David V. Colby challenges the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for social security disability insurance benefits.[1]  Jurisdiction is premised upon 42 U.S.C. § 405(g) (2006).

## FACTS

### 1.   *Medical Evidence*

    Plaintiff was born on February 14, 1953 and was forty-eight years old at the onset of his alleged disability.  (Admin. R. at 87, 96 [filed Aug. 21, 2006] [hereinafter "Admin. R."].)  Plaintiff

---

[1]Although the caption of this case reflects the Commissioner to be Jo Anne B. Barnhart, a new Commissioner, Michael J. Astrue, has been confirmed.

completed the ninth grade, and worked in the vocationally relevant past as a tile setter helper.  (*Id.* at 369.)  Plaintiff alleges that he became unable to work beginning on October 17, 2001 due to a bad back.  (*Id.* at 87.)

    **a.**    ***Pre-Onset Medical Evidence***

An August 25, 1998 x-ray of Plaintiff's right wrist revealed "advanced arthritic changes," with joint space narrowing, numerous cysts, and tissue calcification.  (*Id.* at 229.)  On September 22, 1998, Martin L. Rauer, M.A., C.R.C., C.D.M.S., conducted a vocational assessment of Plaintiff, in which he reviewed Plaintiff's medical history.  (*Id.* at 116–31.)  Mr. Rauer's review indicates Plaintiff: (1) had arthroscopic surgery of the left knee in August 1990; (2) suffered a low back injury causing chronic back pain in January 1992; (3) had low back surgery in September 1994; (4) reinjured his back doing construction work in January 1995; (5) was diagnosed with hepatitis B and C in November 1997; and (5) consistently complained of low back pain through March 1998.  (*Id.* at 120–25.)  Mr. Rauer also reviewed five previous functional capacity evaluations of Plaintiff, which generally revealed that Plaintiff's injuries limited him to light, sedentary work.  (*Id.* at 128–29.)  Mr. Rauer questioned Plaintiff's veracity due to inconsistencies between statements regarding his incapacity.  (*Id.* at 131.)  Mr. Rauer concluded: "I do not question [Plaintiff's] perceptions of pain; I do question his willingness to work in his own best interest and attempt to recapture his residual functional capacities. . . .  [Plaintiff] is able to earn a wage."  (*Id.*)

Further reference to pre-onset medical evidence is omitted due to its marginal relevance. (*See, e.g.*, *id.* at 204–235.)

**b.      Post-Onset Medical Evidence**

On October 25, 2001, C. Patrick Higgins, D.O., examined Plaintiff on behalf of the Colorado Department of Human Services.  (*Id.* at 199–200.)  Dr. Higgins had an ongoing treating relationship with Plaintiff from January 1997 through April 1999. (*See id.* at 204–25.)  Dr. Higgins' sparse notations indicate that Plaintiff's back injury left him with "no work capacity" for twelve months or more.  (*Id.*)

On January 25, 2002, an unidentified doctor at the Marillac Clinic in Grand Junction, Colorado conducted a magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine.  (*Id.* at 238.)  The MRI revealed "multiple disc bulges and significant spinal stenosis," with the "most pronounced abnormalities at L1–2 and L2–3."  (*Id.*)  The MRI further revealed that L4–5 and L5–S1 had been surgically fused.  (*Id.*)  At L1–2, the doctor found "probable bilateral nerve root impingement."  (*Id.*)  At L2–3, the doctor found "likely bilateral nerve root impingement."  (*Id.*)  At L4–5 and L5–S1, the doctor found suspected "left sided nerve root impingement."  (*Id.*)

On March 14, 2002, Joan Michener, M.D. conducted a functional capacity evaluation of Plaintiff.  (*Id.* at 148–153.)  Plaintiff reported: (1) two prior back surgeries, one involving the placement of titanium cylinders in his lumbar spine; (2) back pain with involvement of his left leg; (3) an ability to stand or sit for only five minutes at a time; (4) a prior wrist injury that had necessitated surgery, which resulted in a deformity and an inability to lift heavy objects; and (5) two prior knee surgeries, one on each knee, which made kneeling painful.  (*Id.* at 148–49.)  With respect to his activities of daily living, Plaintiff reported he suffered back pain when he washed

dishes, and noted that his "hobbies include[d] watching television and taking Vicodin." (*Id.* at

149.)  Plaintiff's medications included Elavil, Vioxx, and Vicodin.[2]  (*Id.*)

After conducting a physical examination, Dr. Michener diagnosed: (1) scoliosis with

lumbar pain that radiates into the left leg; (2) "[r]ight wrist injury;" (3) bilateral knee pain; (4)

hepatitis B and C; and (5) bilateral numbness in the arms while sleeping.  (*Id.* at 151.)  Dr.

Michener found Plaintiff's back pain limited him in an eight-hour work day to: (1) standing and

walking for two hours; (2) sitting for six hours, but only for thirty minutes at a time; (3) lifting and

carrying ten pounds frequently and twenty pounds occasionally; and (4) bending occasionally.

(*Id.*)  Dr. Michener further opined that Plaintiff's: (1) knee pain limited him to occasional

kneeling, climbing, crawling, and crouching; (2) wrist pain limited him to occasional handling with

the right hand; and (3) hepatitis might prevent him from working in some jobs due to the

possibility of spreading the disease.  (*Id.* at 152.)  Finally, Dr. Michener noted that lumbar spine x-

rays were pending.  (*Id.*)

On March 20, 2002, Dr. Michener reviewed the spinal x-rays, noting that the results were

consistent with her earlier conclusions.  (*Id.*)  The x-ray report, conducted by J.T. Leever, D.O.,

states: "Two prosthetic devices . . . replace the L4–5 disc, and a similar device is present on the

left at L5–S1 in the intervertebral disc space. . . .  Impression: [] Postsurgical changes . . . ."

(*Id.* at 153.)

---

[2]Elavil is used to treat depression.  J.E. SCHMIDT, M.D., 2–E ATTORNEYS' DICTIONARY OF
MEDICINE 883 (Matthew Bender 2005) (hereinafter "ADM").  Vioxx is used to treat
osteoarthritis.  6–V ADM 1225.  Vicodin is used to treat moderately severe pain.  6–V ADM
1928.

On April 2, 2002, a "vocational specialist" conducted a functional capacity evaluation of Plaintiff.  (*Id.* at 135–37.)  The specialist concluded Plaintiff was capable of unskilled, medium-level work, with occasional stooping, kneeling, crawling, and climbing.  (*Id.* at 135, 137.)

On June 6, 2002, Dr. Higgins conducted a second consultative examination report for the Colorado Department of Human Services.  (*Id.* at 154–55.)  Dr. Higgins' scant notations indicate he determined that Plaintiff's back problems left him with "no work capacity" for twelve months or more.  (*Id.*)

On July 8, 2002, Plaintiff saw Rowland Reid, M.D.  (*Id.* at 183.)  Plaintiff attributed the initial onset of his back problems to an automobile accident and reported that two surgeries had failed to alleviate back pain and numbness in his lower extremities.  (*Id.*)  Plaintiff requested a narcotic pain reliever, but Dr. Reid advised him that he would not prescribe narcotics for chronic back pain.  (*Id.*)  Dr. Reid requested that Plaintiff obtain a spinal x-ray and prescribed Elavil.  (*Id.*)

On July 17, 2002, Stacy Lynn Greenspan, D.O. conducted an x-ray of Plaintiff's lumbar spine.  (*Id.* at 180.)  Dr. Greenspan's impressions were as follows: (1) "[e]ssentially stable lumbar spine when compared to study of [December 8, 1997];" (2) "[s]table, mild, anterior wedge compression deformity of L1;" and (3) "[v]ery mild degenerative spondylosis of the lumbar spine."[3]  (*Id.*)

On July 31, 2002, Plaintiff saw Robert E. Carlton, M.D.  (*Id.* at 179.)  Dr. Carlton noted Plaintiff's history of back surgeries and observed that a recent MRI documented symptoms of

---

[3]Lumbar spondylosis is a degenerative disease of the lumbar vertebrae, marked by stiffness and pain. 3–L ADM 4135.

spinal stenosis.[4]  (*Id.*)  Dr. Carlton suggested that Plaintiff undergo a neurosurgical evaluation.

(*Id.*)

On October 7, 2002, Plaintiff saw James D. Brooke, M.D. for help with chronic pain

control.  (*Id.* at 177–78.)  Plaintiff reported a history of "severe back problems," involving two

surgeries.  (*Id.* at 177.)  Plaintiff told the doctor his pain had recently "been so bad that he

occasionally b[ought] MS Contin . . . on the street for [ten dollars]."[5]  (*Id.*)  Dr. Brooke opined

Plaintiff suffered from hepatitis C, chronic back pain, and spinal stenosis.  (*Id.*)  Dr. Brooke

prescribed one daily dose of Kadian.[6]  (*Id.* at 178.)

On November 7, 2002, Plaintiff followed up with Dr. Brooke, stating that he had not

received his most recent mail-order prescription of Kadian.  (*Id.* at 173.)  Plaintiff reported he: (1)

was taking ibuprofen; (2) had difficulty sleeping; and (3) "[a]mitriptyline and other medications

always cause[d] severe side effects."[7]  (*Id.*)  Dr. Brooke resubmitted paperwork for Plaintiff's

Kadian prescription and prescribed trazodone to help him sleep.  (*Id.*)

---

[4]Spinal stenosis is "[a] narrowing of the spinal canal (the long channel within the bony structure of the spine), usually as a result of hypertrophic (pertaining to abnormal enlargement) degenerative changes of the bony structures."  5–S ADM 5209.

[5]MS Contin is a "slow release tablet[] of morphine sulfate for prolonged relief of severe pain."  4–M ADM 6005.

[6]Kadian is a "capsule[] containing morphine sulfate."  3–K ADM 16.

[7]Amitriptyline is used to treat depression.  1–A ADM 5761.

On the same day, Plaintiff saw Dr. Carlton, stating that he needed a Kadian refill and was suffering from sleep loss, leg cramps, and numbness in his arms and hands. (*Id.* at 170.) Plaintiff also stated that his "bursitis [was] acting up."[8] (*Id.*)

On December 13, 2002, Plaintiff followed up with Dr. Brooke, stating he had some increased lumbar pain as well as pain radiating into his left foot and right buttock, which was causing sleep loss. (*Id.* at 169.) Dr. Brooke continued Plaintiff's Kadian prescription, increased his trazodone prescription, and recommended exercise and an "ice massage." (*Id.*)

On the same day, Plaintiff returned to Dr. Carlton, complaining of: (1) severe pain starting in the lumbar region and proceeding down his leg into his foot; and (2) stiff arms and numbness in both hands. (*Id.* at 166.) As a result, it appears Dr. Carlton increased Plaintiff's dose of Kadian. (*Id.*)

On January 27, 2003, Plaintiff returned to Dr. Brooke, who continued Plaintiff's past medicinal regimen and added a prescription to alleviate gastrointestinal distress. (*Id.* at 165.) The next day, Plaintiff returned to Dr. Carlton. (*Id.* at 162.) Plaintiff complained of gastrointestinal distress and weight loss. (*Id.*) Plaintiff stated that the increased dose of Kadian was helpful, and the higher dose of trazodone helped him sleep "quite well" for seven to eight hours each night. (*Id.*)

---

[8]Bursitis is the inflammation of a bursa, "a sac filled with fluid and placed between moving surfaces that would otherwise rub against each other." 1–B ADM 5121.

On April 4, 2003, Dr. Brooke examined Plaintiff. (*Id.* at 159–61.) Plaintiff indicated he had "pains around his hip[,] his buttocks [were] often numb[,] but overall he [was] doing quite well." (*Id.* at 161.) Dr. Brooke assessed hepatitis C, spinal stenosis, and osteoarthritis. (*Id.*)

On April 21, 2003, Plaintiff received notice from the Department of Veterans Affairs ("VA") that he would begin receiving a disability pension. (*Id.* at 81–85.) The VA determined Plaintiff was disabled, per its rules, due to low back degenerative joint disease, bilateral knee degenerative joint disease, and hepatitis C. (*Id.* at 84.)

On April 28, 2003, a nurse practitioner filled out a form summarizing Plaintiff's low back pain symptoms. (*Id.* at 156.) The form indicates that Plaintiff complained of "burning" and "numbing" sensations in his back, along with numbness in his right buttock and shooting pain in his right leg. (*Id.*) The nurse assessed chronic back pain and appears to have prescribed a muscle relaxant and physical therapy. (*Id.*)

On July 21, 2003, Plaintiff returned to Dr. Brooke. (*Id.* at 282.) Plaintiff reported that after sitting at a funeral, "when he went to get up, both legs were asleep and then were tingly." (*Id.*) Dr. Brooke noted that Kadian helped Plaintiff's pain, but "he [was] still in bad pain much of the time." (*Id.*) Dr. Brooke prescribed Neurontin and increased Plaintiff's trazodone prescription.[9] (*Id.*)

---

[9]Neurontin is a "drug used in the treatment of partial seizures in patients with epilepsy." 4–N ADM 1964. It would seem that the drug also has off-label applications.

In a letter dated August 7, 2003, Dr. Higgins stated that Plaintiff was "completely and permanently disabled" and diagnosed Plaintiff with: (1) a herniated disc; (2) spinal stenosis; and (3) "[c]hronic, [s]evere, [i]rretractable low back pain." (*Id.* at 236.)

On August 28, 2003, Plaintiff followed up with Dr. Brooke, reporting that he had gone through a three-week spell where his back pain was much worse and his legs felt cramped and cold, but he had improved markedly in the past three days. (*Id.* at 278.) Plaintiff stated that he had yet to receive Neurontin and that he had experienced "good results from epidural steroids a few years ago, but did not want to keep doing them." (*Id.*) Dr. Brooke noted that Plaintiff had been "refused again for disability." (*Id.*) In a letter dated the same day, Dr. Brooke represented that Plaintiff "ha[d] <u>no</u> capacity for competitive employment due to spinal stenosis and chronic pain." (*Id.* at 237 [emphasis in original].)

On October 20, 2003, Plaintiff returned to Dr. Brooke. (*Id.* at 274.) Plaintiff reported that he had yet to receive Neurontin. (*Id.*) Plaintiff indicated he "ha[d] pretty good pain control on Kadian . . . though he [was] getting more funny leg pains." (*Id.*)

On November 6, 2003, Paul E. Bauer, D.O. conducted an MRI of Plaintiff's lumbar spine. (*Id.* at 271–72.) Dr. Bauer compared this MRI to a 1997 MRI and to the July 17, 2002 x-ray conducted by Dr. Greenspan. (*Id.* at 271.) Dr. Bauer found: (1) "postoperative changes . . . at L4–5 and L5–S1 without evidence of recurrent disc disease," with "subtle contrast enhancement" that could "potentially involve the left S1 nerve root in its proximal lateral recess;" (2) "multilevel disc degenerative changes and varying degrees of canal narrowing, most prominent at L1–2 and L2–3;" and (3) "[f]acet joint degenerative changes at L4–5 and L5–S1." (*Id.* at 272.)

On January 15, 2004, Plaintiff returned to Dr. Brooke, reporting that he recently had the second of three epidural block injections and that the third would be performed the next day. (*Id.* at 290.)  Plaintiff reported that the "first helped significantly, the second hurt more and made him feel a little worse but . . . he [was] doing better . . . ." (*Id.*)

On March 14, 2004, Plaintiff reported to Dr. Brooke that he was "getting more depressed" and was having suicidal thoughts. (*Id.* at 289.)  Plaintiff indicated he would like to try antidepressants. (*Id.*)  Dr. Brooke prescribed an antidepressant and MS Contin and noted: "[Plaintiff] has been without narcotics now for [three] weeks and has been having some unusual sweating spells.  He thought perhaps it was male menopause.  I think it is probably mild withdrawal." (*Id.*)

On June 14, 2004, Plaintiff reported to Dr. Brooke that he was very happy with his antidepressant and that "everyone around him [said] he [was] a different person." (*Id.* at 288.)  Plaintiff further reported he was sleeping well, often nine hours a night. (*Id.*)  Plaintiff indicated he "was quite happy with the morphine also," but that the pain which used to be on his left side was now "a little more on the right." (*Id.*)  Plaintiff further noted that he occasionally had spells where he was bedridden with pain for two or three days at a time. (*Id.*)  Dr. Brooke continued Plaintiff's medications and suggested that he stay physically active. (*Id.*)

On August 16, 2004, Plaintiff reported to Dr. Brooke that his antidepressant had suddenly "seemed to backfire" when he had an emotional outburst. (*Id.* at 287.)  Plaintiff had stopped taking the drug and had experienced no further outbursts. (*Id.*)  Plaintiff reported "some pinching on the right side" and stiffness in his legs. (*Id.*)  Plaintiff indicated he walked every day and had

once walked "several miles and had to call his brother to come pick him up as his legs were too tired, but most of the time he d[id] well." (*Id.*)

On November 9, 2004, Plaintiff returned to Dr. Brooke, complaining of pinching sensations in his left leg and numbness in his hands. (*Id.* at 286.)  Plaintiff reported that the most recent epidural block seemed to do nothing. (*Id.*)  Dr. Brooke gave Plaintiff information on exercising and told Plaintiff "he probably ha[d] [degenerative disc disease] in the cervical spine as well as the lumbar." (*Id.*)  Dr. Brooke renewed Plaintiff's prescription for MS Contin. (*Id.*)

On December 9, 2004, Plaintiff went for an initial appointment at a VA clinic in Denver, Colorado with Timothy C. Vogel, F.N.P. (*Id.* at 298–307.)  Plaintiff reported he was taking only MS Contin and gastrointestinal medication. (*Id.* at 298.)  Plaintiff described agonizing back pain. (*Id.* at 299.)  Plaintiff's depression screen was positive, with a history of panic attacks. (*Id.* at 301.)  Plaintiff complained that his knees "g[a]ve out," but Mr. Vogel noted Plaintiff exhibited no pain, redness, or swelling. (*Id.* at 302.)  On exam, Mr. Vogel found Plaintiff's lumbar spine exhibited decreased flexion and extension. (*Id.* at 304.)  Mr. Vogel also noted that Plaintiff: (1) felt pain with flexion of more than forty-five degrees, with evidence of symptoms to the abdomen and lumbar spine; and (2) had decreased strength in his right hand due to a past surgery. (*Id.*)  Plaintiff indicated he was unwilling to do physical therapy. (*Id.*)

On March 18, 2005, Plaintiff returned to the VA clinic for a follow-up appointment. (*Id.* at 318–19.)  Plaintiff had previously called to complain that his opiates were not working, stating that he wanted to go back to MS Contin. (*Id.* at 319.)  Plaintiff subsequently received MS Contin through Dr. Brooke. (*Id.*)  A radiologist reviewing a spinal x-ray taken that day found Plaintiff

suffered from mild scoliosis, but found no abnormalities other than the previous surgical fusion of two of Plaintiff's vertebrae.  (*Id.* at 332.)

On May 16, 2005, Plaintiff returned to Dr. Brooke, noting that the ibuprofen he was taking for his arthritis was not helpful.  (*Id.* at 327.)  Dr. Brooke prescribed a drug to treat arthritis.  (*Id.*)

On July 17, 2005, Plaintiff underwent an MRI of his lumbar spine at the VA clinic.  (*Id.* at 330–31.)  The MRI revealed Plaintiff's prior fusion surgery and a "[f]oraminal compromise" at the L5–S1, which warranted further evaluation.  (*Id.*)

On September 2, 2005, Plaintiff told Dr. Brooke that he had recently felt something pop in his back, and ever since his right leg had worsened, becoming weak and prone to cramps.  (*Id.* at 346.)  Plaintiff also complained of sleep loss.  (*Id.*)  Dr. Brooke authorized a refill of MS Contin. (*Id.*)

On September 8, 2005, Plaintiff returned to the VA clinic, noting the worsening of his legs since feeling the pop in his back.  (*Id.* at 335.)  Plaintiff reported a history of bursitis and also complained of bilateral shoulder pain.  (*Id.*)  Mr. Vogel recommended that Plaintiff see a neurosurgeon and prescribed an anti-inflammatory drug for Plaintiff's shoulder pain.  (*Id.* at 337.)

On October 20, 2005, Michael J. Brantley, M.D. conducted a computed tomography ("CT") scan of Plaintiff's lumbar spine.  (*Id.* at 348–51.)  Dr. Brantley found: (1) bilateral disc protrusions into the nerve canals at the L2–3 vertebrae; (2) mild changes of the central canal at L3–4; (3) mild bilateral encroachment of the nerve canals at L4–5; and (4) multiple

encroachments producing a compromise of fifty to sixty percent of the left nerve canal at L5–S1.

(*Id.* at 348–49.)

   *c.*      ***Evidence Post-Dating the Commissioner's Decision***

   In a form drafted by Plaintiff's counsel dated March 13, 2006, Mr. Vogel and Dr. Brooke

separately answered in the affirmative questions asking whether Plaintiff's condition prevented

him from: (1) "walk[ing] a block at a reasonable pace on rough or uneven surfaces;" and (2)

"carry[ing] out routine ambulatory activities such as banking and shopping." (*Id.* at 357–58,

360–61.) Mr. Vogel and Dr. Brooke also answered yes to a question asking whether Plaintiff's

impairments "me[t] or equal[ed] the severity of listing[s] 1.02 [and] 1.04."[10] (*Id.* at 358–59;

361–62.) In support of his answers regarding both listings, Mr. Vogel noted that Plaintiff: (1) had

disc protrusions in the spine; (2) exhibited decreased range of motion and deep tendon reflexes on

exam; (3) suffered increased pain with activity; and (4) had hip, knee, and shoulder pain. (*Id.* at

359.) In support of his answer regarding Listing 1.02, Dr. Brooke noted that Plaintiff: (1) had a

bony prominence in his right wrist, causing a decreased range of motion; (2) favored his right leg

due to knee surgery; and (3) had a decreased range of motion in his right leg. (*Id.* at 362.) In

support of his answer regarding listing 1.04, Dr. Brooke noted that Plaintiff had: (1) "some spinal

stenosis;" (2) encroachment of the exiting spinal nerves at L5–S1; and (3) greatly decreased spinal

extension and moderately decreased spinal flexion. (*Id.*) Dr. Brooke also noted that he had tried

---

   [10]Listing 1.02 concerns joint dysfunction. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1.02
(2007). Listing 1.04 concerns disorders of the spine. *See id.* App. 1.04.

many different treatments to reduce pain and increase function, but that ultimately surgery might be Plaintiff's only option.  (*Id.*)

## 2.      *Procedural History*

On October 24, 2001, Plaintiff filed an application for disability insurance benefits.  (*Id.* at 96.)  On April 10, 2002, the Social Security Administration denied Plaintiff's application.  (*Id.* at 38–42.)  On April 29, 2002, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 43.)  On July 3, 2003, the ALJ held a hearing, at which Plaintiff testified.  (*Id.* at 365–81.)  On August 5, 2003, the ALJ issued a decision denying Plaintiff's claim.  (*Id.* at 242–49.)  On September 12, 2003, Plaintiff filed a request for review of the ALJ's decision with the Appeals Council.  (*Id.* at 250.)  On December 13, 2004, the Appeals Council determined that Plaintiff had submitted new, relevant evidence that might undermine the ALJ's prior decision.  (*Id.* at 258–59.)  Thus, the Appeals Council remanded, commanding the ALJ to: (1) afford Plaintiff the opportunity of a new hearing; (2) obtain medical information from treating sources; (3) obtain one or more consultative examinations; (4) consider the entire record, including new arguments and additional evidence; (5) provide a rationale for the weight he accorded to medical opinions; and (6) address the credibility of Plaintiff's subjective complaints of pain.  (*Id.* at 259.)

On November 9, 2005, the ALJ held a hearing, at which both Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (*Id.* at 382–94.)  Plaintiff testified that he took two MS Contin pills a day for his back pain.  (*Id.* at 386.)  Plaintiff indicated that the drug "just barely t[ook] the pain away . . . and ma[de] it just to where it [was] kind of tolerable."  (*Id.*)  On a scale of one to ten, Plaintiff rated his daily pain at ten.  (*Id.*)  Plaintiff stated

he had suffered such pain since 1991, when he reinjured his back doing tile work.  (*Id.* at

387–88.)  Plaintiff described pain in "both sides of [his] back into [his buttocks] all the way down

into [his] legs," which resulted in "[s]evere leg cramps, numbness, coldness, [and a] burning

sensation."  (*Id.* at 389.)  As a result, Plaintiff asserted that he slept only two or three hours on

average, and that a recent night of seven hours sleep was "a treat."  (*Id.*)  Plaintiff stated that his

back pain left him bedridden for three or four days at a time, two or three times each month.  (*Id.*

at 389.)

Plaintiff testified he was not on any sleeping medicine other than over-the-counter pills

because he had developed a tolerance to trazodone.  (*Id.* at 390.)  Plaintiff stated that he spent

most of his time watching television and that he could walk only one-quarter mile.  (*Id.*)  Plaintiff

testified that he could not sit for long because of numbness in his back and buttocks, accompanied

by "[a] lot of anxiety."  (*Id.*)  With respect to standing, Plaintiff testified that it caused numbness

and severe cramping in his feet and toes.  (*Id.* at 390–91.)

The VE testified at the hearing regarding the vocational exhibits in Plaintiff's file.  (*Id.* at

391–93.)  The ALJ posed the following hypothetical:

> an individual with the same age and educational background as [Plaintiff] limited
> to an exertional level in a full range of light [work] with no foot or leg controls,
> only occasional bending, squatting, kneeling, crawling, or climbing, a need . . . to
> be . . . home for three or four days at a time two or three days [sic] a month.

(*Id.* at 391–92.)  The VE testified that no employment existed for such a person.  (*Id.* at 392.)

The ALJ posed a second hypothetical: "Assume all of the restrictions I gave you in the

first hypothetical except the limitation as to his absence.  Are there jobs that are compatible with

those limitations assuming he's able to be there to do it?" (*Id.*)  The VE answered in the affirmative, giving three examples of work that such a person could perform: cashier, assembler of small products, or video rental clerk.  (*Id.*)  Counsel then inquired as to the handling demands of each job, and the VE responded that each required frequent handling and fingering.  (*Id.* at 393.)

On February 9, 2006, the ALJ issued a decision, finding that Plaintiff was not eligible for supplemental security income.  (*Id.* at 14–22.)  In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.* at 15.)  Second, the ALJ determined that the "degenerative changes of [Plaintiff's] lumbar spine" and "history of knee problems" constituted "severe" impairments.  (*Id.* at 16.)  The ALJ further determined there was an absence of evidence indicating Plaintiff's hepatitis C limited his "ability to perform work-like activities."  (*Id.* at 17.)  The ALJ also noted Plaintiff had a history of a right wrist fracture and resulting limited range of motion, but emphasized that in a September 1998 vocational assessment, Plaintiff had "minimized the effects of [the] wrist fracture."  (*Id.*) Thus, the ALJ concluded that Plaintiff's wrist injury did not significantly limit his ability to perform basic work activities.  (*Id.*)

Third, the ALJ compared Plaintiff's impairments with those described in Appendix 1 of Subpart P of Social Security Regulations No. 4.  (*Id.*)  The ALJ determined that Plaintiff "d[id] not have an impairment or combination of impairments which [met] the criteria of any of the listed impairments because none of the treating or examining physicians of record ha[d] reported any of the necessary clinical, laboratory, or radiographic findings specified therein."  (*Id.*)  With respect

to the section concerning musculoskeletal impairments, the ALJ specifically found that there was "nothing in the file to indicate an inability to ambulate effectively." (*Id.*)

Fourth, the ALJ determined Plaintiff's residual functional capacity ("RFC"). (*Id.*)  In so doing, the ALJ assessed Plaintiff's credibility, finding he "was not a fully persuasive witness." (*Id.* at 18.)  The ALJ noted that objective tests had "shown only minimal degenerative changes in Plaintiff's lumbar spine." (*Id.*)  Citing to the March 14, 2002 functional capacity evaluation, the ALJ noted that Plaintiff "was able to sit and lie down without discomfort and had [full] motor strength in all extremities." (*Id.*)  The ALJ compared Plaintiff's testimony that he could not walk with his representation to Dr. Brooke, on August 16, 2004, that he walked every day, but his legs grew tired after walking several miles. (*Id.*)  The ALJ noted that Plaintiff's refusal to do physical therapy at the VA clinic "further erod[ed] [his] credibility." (*Id.*)  The ALJ indicated that Plaintiff's treating physicians had determined him to have normal gait and station notwithstanding his allegations of disabling back pain. (*Id.*)  The ALJ further noted that December 2004 VA treatment notes indicating Plaintiff had intact, symmetrical reflexes, a normal gait, and intact sensation to light touch were inconsistent with his "allegations of numbness and paresthesias in his legs." (*Id.*)  Thus, the ALJ concluded: "Considering the foregoing, most notably the lack of objective findings and inconsistencies in [Plaintiff's] description of his activities, [Plaintiff's] complaints . . . are given little weight." (*Id.* at 18–19.)

Thus, the ALJ settled upon Plaintiff's RFC, finding Plaintiff could: (1) push, pull, lift, or carry up to twenty pounds occasionally and ten pounds frequently; (2) sit, stand, or walk six hours during an eight-hour day; (3) climb, balance, stoop, kneel, crouch, or crawl occasionally; and (4)

use no foot or leg controls at all.  (*Id.* at 19.)  The ALJ specifically discounted letters submitted by Dr. Higgins and Dr. Brooke, noting that both merely stated that Plaintiff was disabled without giving any indication of his "actual" RFC.  (*Id.*)  The ALJ also considered the disability determination prepared by the VA, affording it only minimal weight because it was made under agency rules rather than social security regulations.  (*Id.*)  Further, the ALJ noted the VA decision did not discuss the evidence upon which its disability determination was based.  (*Id.*)  The ALJ gave "moderate weight" to Dr. Michener's March 2002 functional capacity evaluation, accepting its assessments of Plaintiff's lifting and carrying abilities, but rejecting its determination that Plaintiff could walk for no more than two hours each day in light of Plaintiff's "statements to Dr. Brooks [sic] that he 'walks well' and was able to walk for several miles."  (*Id.*)

Next, the ALJ determined that Plaintiff's impairments precluded him from returning to his past relevant work.  (*Id.* at 20.)  Finally, the ALJ determined that Plaintiff retained the RFC to work as a cashier, small products assembler, or video rental clerk — jobs that existed in significant numbers in the national economy.  (*Id.*)

On April 7, 2006, Plaintiff requested a review of the ALJ's decision.  (*Id.* at 10.)  On May 3, 2006, the Appeals Council affirmed the ALJ's decision.  (*Id.* at 5–8.)  On June 13, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed June 13, 2006].)  On October 26, 2006, Plaintiff filed his opening brief.  (Pl.'s Opening Br. [filed Oct. 26, 2006] [hereinafter "Pl.'s Br."].)  On December 1, 2006, the Commissioner filed a response.  (Def.'s Resp. Br. [filed Dec. 1, 2006] [hereinafter "Def.'s

Resp."].)  On December 15, 2006, Plaintiff filed his reply.  (Pl.'s Reply Br. [filed Dec. 15, 2006]

[hereinafter "Pl.'s Reply"].)  This matter is fully briefed.

## ANALYSIS

*1.     Standard of Review*

        Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, and where a claim has been denied by
> the Commissioner of Social Security or a decision is rendered under subsection (b)
> of this section which is adverse to an individual who was a party to the hearing
> before the Commissioner of Social Security, because of failure of the claimant or
> such individual to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question of
> conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Jozefowicz v. Heckler*, 811

F.2d 1352, 1357 (10th Cir. 1987) (citations omitted).  The court must uphold the Commissioner's

decision if it is supported by substantial evidence.  *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th

Cir. 1987).  This court cannot reweigh the evidence nor substitute its judgment for that of the

ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does not mean, however, that this court's review is merely cursory.  To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).  In proving disability, a claimant must make a *prima facie* showing that he is unable to return to the work he previously performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national

economy provides a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at

512.

     The Commissioner has established a five-step process to determine whether a claimant

qualifies for disability-insurance benefits.  *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*,

482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled

or not disabled at any step; and, upon such a determination, the subsequent steps may be

disregarded.  *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th

Cir. 1988).  First, the claimant must demonstrate that he is not currently involved in any

substantial gainful activity.  20 C.F.R. § 404.1520(b) (2007).  Second, the claimant must show a

medically severe impairment (or combination of impairments) which limits his physical or mental

ability to do basic work activities.  *Id.* § 404.1520(c).  At the third step, if the impairment matches

or is equivalent to established listings, then the claimant is judged conclusively disabled.  *Id.* §

404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis

proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents

him from performing work he has performed in the past.  *See Williams*, 844 F.2d at 751 (citations

omitted).  If the claimant is able to perform his previous work, then he is not disabled.  20 C.F.R.

§ 404.1520(e) (2007); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to

demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's

age, education, past work experience; and (2) there is availability of that type of work in the

national economy.  *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.

### 3. *Disability Determination*

Plaintiff sets forth three arguments in support of his contention that the ALJ's decision is erroneous.  (Pl.'s Br. at 21–26.)  Plaintiff asserts that the ALJ erred by: (1) improperly discounting the opinion of his treating physicians; (2) improperly determining his RFC; and (3) failing to consider each of his impairments at step five.[11]  (*Id.*)  I consider each argument in turn.

### a. *Treating Physicians' Opinions*

Plaintiff makes a handful of arguments under the overarching contention that the "ALJ failed to determine if Drs. Brooke, Higgins[,] and Vogel's opinions that [Plaintiff] was 'disabled' at step-three [sic] (Brooke and Vogel) and at step-five [sic] were 'well-supported . . . [and] consistent with other substantial evidence in the record.'"  (*Id.* at 14 [quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)].)  More specifically, Plaintiff argues that: (1) the ALJ failed to give the treating physicians' opinions appropriate weight and deference; (2) the ALJ "minimized" findings of degenerative changes to Plaintiff's lumbar spine; and (3) the ALJ employed a "hunt and peck" analysis, citing one of a few entries in the record suggesting "normal gait and station," when the record otherwise demonstrated "chronic limping."  (*Id.* at 22–23.)  For good measure, Plaintiff throws in a contention that the ALJ erred by relying on one part of consultative examiner Dr. Michener's opinion while rejecting the rest.  (*Id.*)  I consider Plaintiff's arguments below.

---

[11]I have reordered Plaintiff's arguments for the sake of clarity and continuity.

An ALJ must follow a sequential analysis when evaluating the opinion of a treating physician. *Watkins*, 350 F.3d at 1300. In the first step of this analysis, he must consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. *Id.* (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2). "If the answer to this question is 'no,' then the inquiry at this stage is complete," and he need not give the opinion controlling weight. *Id.* If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. *Id.* If the opinion is inconsistent with other substantial evidence, then it is not entitled to controlling weight. *Id.*

If he determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must next consider whether the opinion should be rejected altogether or assigned some lesser weight. *Id.* He does this by applying the factors provided in 20 C.F.R. § 404.1527:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995); *Watkins*, 350 F.3d at 1300. The ALJ must give good reasons for the weight he ultimately assigns to the non-controlling opinion. *Id.* If he rejects it altogether, he must give "specific, legitimate reasons" for doing so. *Id.* (quotation omitted).

Somehow it has escaped Plaintiff's notice that Mr. Vogel is *not* a doctor, but rather is a family nurse practitioner. (*See, e.g.*, Admin. R. 298 [bearing signature of "Timothy C Vogel,

-23-

FNP"].)  This oversight is singularly perplexing.  Incredibly, the Appeals Council already apprised Plaintiff of this fact when it denied his second appeal of the ALJ's decision, but he still failed to take heed.  (*See id.* at 6.)  Regardless, the opinion of a nurse practitioner is not an "acceptable medical source" and, thus, merits little deference.  *See* 20 C.F.R. § 404.1513(a), (d)(1) (2007) (listing "acceptable medical sources" who can provide evidence of an impairment, and excluding nurse practitioners); *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (noting that reports from medical sources other than those of physicians are not entitled to significant weight); *see Winckler v. Barnhart*, 210 F. App'x 639, 640 (9th Cir. 2006) (stating "the ALJ properly rejected the medical opinion of the nurse practitioner, as she was not an acceptable medical source").  As the opinions of a nurse practitioner are not within the ambit of the treating physician rule, the ALJ did not err by failing to consider Mr. Vogel's opinions thereunder.

Although Plaintiff contends Dr. Higgins is a treating physician, the record suggests otherwise.  As the ALJ noted in his decision, the record contains pre-onset treatment notes from Dr. Higgins covering the period running from January 1997 through April 1999.  (Admin. R. at 16, 203–28.)  After Plaintiff's alleged October 2001 onset, Dr. Higgins only twice saw Plaintiff — both times in his capacity as a medical examiner for the Colorado Department of Human Services.  (*Id.* at 154–55, 199–200.)  The notes from both visits are scant to say the least, merely offering the bare conclusion that abnormalities in Plaintiff's "extremities, back" precluded him from working for twelve months or more.  (*Id.*)  Thus, the record demonstrates that Dr. Higgins only saw Plaintiff in a consultative capacity after the alleged onset of his disability.  Accordingly, the

ALJ did not err by failing to consider those opinions within the framework of the treating physician rule.

Although Plaintiff generally contends that the ALJ rejected Dr. Brooke's opinions, he neglects to specify what opinion the ALJ wrongly rejected or why any such rejection was erroneous. (*See* Pl.'s Br. at 23.) Regardless, the only aspect of Dr. Brooke's opinions that the ALJ appears to have rejected was a letter dated August 28, 2003, in which Dr. Brooke represented that Plaintiff "has <u>no</u> capacity for competitive employment due to spinal stenosis and chronic pain." (Admin. R. at 19, 237 [emphasis in original].) As the ALJ stated, this opinion gave "no indication of [Plaintiff's] actual functional abilities." (*Id.* at 19.) The ALJ did not err: a treating physician's opinion that a claimant is "totally disabled" is "not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

I now turn to Plaintiff's assertion that the ALJ "minimized objective evidence of spinal stenosis, lumbar degenerative disc disease[,] and nerve root impingement." (Pl.'s Br. at 22.) In his decision, the ALJ determined that "there is clearly evidence of degenerative changes in the claimant's lumbar spine and he has a history of knee surgery . . . and some evidence of nerve root impingement." (Admin. R. at 17.) This determination dovetails with the ALJ's sound conclusion that Plaintiff's "degenerative changes of the lumbar spine and a history of knee problems . . . constitute severe impairments."[12] (*Id.* at 21.) In light of the ALJ's determination

---

[12]A severe impairment is an "impairment or combination of impairments which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §

that Plaintiff's back and knee problems significantly limited his physical ability to do basic work activities, Plaintiff's contention that the ALJ "minimized" evidence of his impairments is singularly confounding.

Plaintiff also complains that the ALJ conducted a "hunt and peck" analysis by picking out evidence that Plaintiff had "normal gait and station," when the record revealed he had a "chronic limp" from 1998 to 2003. (Pl.'s Br. at 23.) While Plaintiff is correct that the selective reading of record evidence may constitute reversible error, *see, e.g.*, *Teter v. Heckler*, 775 F.2d 1104, 1106 (10th Cir. 1985), I find that the ALJ's determination that Plaintiff was not disabled by his back and knee impairments is supported by substantial evidence. While Plaintiff focuses narrowly on his "chronic limp" as evidence of broader impairment, (Pl.'s Br. at 23), I note that Plaintiff furnishes no support for the implicit assertion that a chronic limp is conclusive evidence of disability. Moreover, while Plaintiff correctly points to post-onset evidence in the record noting that he (1) had "a mild limp, favoring his left side," (2) had a "limp [that] favors right side," (3) "?, [sic] favors one leg part of time," and (4) "limp[ed] lightly," (Admin. R. at 150, 168, 172, 281), this evidence hardly undermines the ALJ's ultimate determination that "there is nothing in the file to indicate an inability to ambulate effectively," (*id.* at 17). Indeed, the ALJ's determination is entirely consistent with Dr. Brooke's notation in 2004 that Plaintiff reported going for daily walks notwithstanding some "pinching on the right side" and stiffness in his legs. (*Id.* at 287.)

---

404.1520(c) (2007).

The only argument that remains is Plaintiff's triply misplaced assertion that "the ALJ erred by relying on a part of Dr. Michener's opinion while rejecting the other." (Pl.'s Br. at 15.) The argument is literally misplaced in Plaintiff's brief insofar as Dr. Michener is not a treating source, but rather a consultative examiner. (*See id.* at 148–53.) The argument is logically misplaced insofar as it makes perfect sense to allow an ALJ to reject a part of a medical opinion, particularly when an aspect of the opinion is "inconsistent with the record as a whole." *See* 20 C.F.R.§ 404.1527(d) (2007). This is precisely what the ALJ did: while he accepted Dr. Michener's finding that Plaintiff was restricted to carrying twenty pounds occasionally and ten pounds frequently, he rejected her further finding that Plaintiff was "restricted to walking no more than [two] hours per day, based on [Plaintiff's own] statements to Dr. Brooks [sic] that he 'walks well' and was able to walk for several miles." (Admin. R. at 19.) Finally, Plaintiff's argument is legally misplaced. Plaintiff contends that *Jozefowicz*, 811 F.2d at 1358, supports his contention that it is error for an ALJ to accept one part of an opinion while rejecting another. (Pl.'s Br. at 14, 16.) In *Jozefowicz*, the Tenth Circuit determined that the ALJ erred when he "apparently accepted the judgments of the treating physicians that the claimant could not do work that involved prolonged walking or standing, while simultaneously rejecting their judgments that she also could not do work that involved prolonged sitting." 811 F.2d at 1358. Unlike the findings in *Jozefowicz*, here, Dr. Michener's findings regarding Plaintiff's capacity to lift weight with his arms are not part and parcel of her findings concerning his ability to walk. Also unlike *Jozefowicz*, the ALJ in this case rejected Dr. Michener's finding based on a clearly stated rationale — a rationale expressly

sanctioned by social security regulations.  Thus, the ALJ cannot be said to have erred by accepting only part of Dr. Michener's opinion.

### b.    *RFC Determination*

Plaintiff argues that: (1) "[b]y ignoring the functional affects [sic] of [his] right upper extremity and bursitis, etc., the ALJ committed reversible error by failing to consider [Plaintiff's] combination of impairments;" (2) "[b]y failing to consider [Plaintiff's] right upper extremity impairment and by outweighing [sic] the lumbar MRI and CT scans by [sic] an x-ray, the ALJ failed to properly [sic] consider the evidence;" (3) "the ALJ failed to determine whether of [sic] not [Plaintiff's] medical impairments 'could reasonably be expected to product the pain or other symptoms alleged;'" (4) "[t]he ALJ held [sic] a higher standard for [substantial gainful activity] than is required;" (5) "the ALJ failed to adequately [sic] discuss his ability to perform [substantial gainful activity] in a full-time work setting given the stressful demands of employment in a competitive work environment and hold the job for a significant period of time;" and (6) "[t]he ALJ set RFC levels at times above those made before his latest back injury, at other times, not even including previous restrictions, as though his condition somehow improved, when the medical evidence shows a deteriorating back condition."  (Pl.'s Br. at 25–26.)  The incoherence of Plaintiff's arguments is surpassed only by their incorrectness.  I consider each contention in turn.

First, Plaintiff appears to argue that the ALJ failed to consider the impact of the combination of his impairments — *i.e.*, his back and knee problems together with his "right upper extremity [impairment] and bursitis" — on his RFC.  (*Id.* at 25.)  Congress has provided that "[i]n determining whether an individual's . . . impairments are of a [disabling] severity . . . , the [ALJ]

shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2006). As explained below, the ALJ properly considered Plaintiff's wrist ailment and bursitis.

With respect to Plaintiff's wrist, the ALJ determined that Plaintiff's prior right wrist injury had a minimal impact on his capacity to do work. (Admin. R. at 19.) In light of a lack of findings that Plaintiff's occasional complaints of wrist pain were significant, this decision was well-founded. (*See id.* at 151–52, 298, 304, 310, 339 [revealing occasional complaints of mild wrist pain].) Moreover, the ALJ's limitation of Plaintiff to lifting or carrying twenty pounds occasionally and ten pounds frequently comports with Plaintiff's own statement to Dr. Michener that he felt wrist pain when he lifted heavy objects. (*Id.* at 21, 148.)

With respect to Plaintiff's bursitis, Plaintiff points to two pieces of record evidence which he contends indicate he suffers from bursitis. (*See* Pl.'s Br. at 21 [citing Admin. R. at 161, 235].) However, neither of the two cited pieces of medical evidence even mentions bursitis. (Admin. R. at 161, 235.) Whether this failure is due to sloppiness or mendacity, I admonish Plaintiff's counsel for wasting the court's time. Regardless, the scant record of incidence of Plaintiff's bursitis leads me to conclude that the ALJ's decision was sound. (*See id.* at 170 [reporting bursitis was acting up], 335 [reporting history of bursitis].)

Second, Plaintiff appears to argue that, in determining his RFC, the ALJ improperly relied on an x-ray which ran counter to a subsequent MRI and CT scan. (Pl.'s Br. at 22–23, 25–26.) Specifically, with brazen disregard for the connection between context and meaning, Plaintiff

attempts to create a false connection between: (1) the ALJ's statement — which was made in a section of the decision in which the ALJ *summarized his prior decision* — that "a July 2002 diagnostic imaging report indicated only minimal degenerative changes in [Plaintiff's] lumbar spine;" and (2) the ALJ's subsequent RFC-related determination that, among other evidentiary failings, a "lack of objective findings" of disability supported his finding that Plaintiff's complaints of pain were not "fully persuasive." (*Id.* at 22–23; Admin. R. at 15, 18.) The ALJ did not discuss the July 2002 x-ray in the course of his RFC determination, so Plaintiff's argument is misleading. Moreover, it is clear from the ALJ's discussion of the evidence that the "lack of objective findings" to which he referred was *not* a lack of findings of degenerative changes to Plaintiff's lumbar spine, but rather a lack of findings that Plaintiff's reflexes, sensation to touch, and gait were meaningfully impacted by such degeneration. (*See* Admin. R. at 19); 20 C.F.R. Pt. 404, Subpt. P., App. 1.04A (2007) (requiring proof of motor loss accompanied by sensory or reflex loss). Thus, Plaintiff's assignment of error fails.

Third, Plaintiff asserts the ALJ failed to consider whether his impairments could reasonably be expected to produce the pain he alleged. (Pl.'s Br. at 26 [citing 42 U.S.C. § 423 (d)(2)(A)].) Again, I disagree. The ALJ specifically considered the objective evidence of Plaintiff's symptoms and determined that Plaintiff's own statements regarding his pain and capacity for exertion were inconsistent with such evidence. (Admin. R. at 18–19.) This is precisely the sort of inquiry mandated by Congress. *See* 42 U.S.C. § 423 (d)(5)(A) (2006) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . .; there must be medical signs and findings, established by medically acceptable

clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . .").

Fourth, Plaintiff argues that the ALJ applied a higher standard for substantial gainful employment than is required. (Pl.'s Br. at 26.) Plaintiff contends the ALJ required him to show "'a total inability to engage in [substantial gainful activity].' [Plaintiff] doesn't [sic] have to show a total 'inability.' This sounds too much like unable to do any work." (*Id.*) I find that Plaintiff: (1) misrepresents the ALJ's position by taking it out of context; and (2) makes a mountain out of a molehill. In his decision, the ALJ stated that he "cannot find [*Plaintiff*] fully credible in *his* assertions regarding a total inability to engage in substantial gainful activity." (Admin. R. at 18 [emphases added].) Thus, in context, it appears not that the ALJ imposed a higher standard, but that Plaintiff himself asserted such a "total inability." Regardless, throughout his analysis, the ALJ was clearly focused on whether Plaintiff was able to perform substantial gainful activity — *i.e.*, work of a level and duration whereby Plaintiff could support himself without the help of the federal fisc. *See* 20 C.F.R. § 404.1572(a)–(b) (2007). There is no error.

Fifth, citing to *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994), Plaintiff contends "the ALJ failed to adequately [sic] discuss his ability to perform [substantial gainful activity] in a full-time work setting given the stressful demands of employment in a competitive work environment and hold the job for a significant period of time." (Pl.'s Br. at 18.) To the extent this argument is decipherable, it is wholly disingenuous. In *Washington*, the plaintiff presented evidence that he was blind in the right eye and had impaired vision in the left. 37 F.3d

at 1439.  Understandably, the court faulted the ALJ for his "complete[] fail[ure] to consider [the]

plaintiff's vision loss" in determining that the plaintiff retained the RFC to return to his past

relevant work as a *barber.  Id.* at 1439, 1442.  Thus, the court determined the ALJ erred, *inter*

*alia*, by failing "to make the necessary findings regarding the physical and mental demands of

[the] plaintiff's past relevant work," since the "record contained little or no evidence concerning

the physical demands of those jobs."  *Id.* at 1442.  Here, the ALJ determined that Plaintiff could

not return to his past relevant work.  (Admin. R. at 20.)  Thus, the ALJ rightly turned to the VE's

testimony and found that Plaintiff's RFC would allow him to perform light, unskilled labor.  (*Id.*

at 20, 392.)  *Washington* requires nothing more.

Sixth, Plaintiff complains that the ALJ's determination of Plaintiff's RFC was "at times

above those made before his latest back injury" and "at other times" did not include "previous

restrictions" even though the record demonstrates Plaintiff suffered a "deteriorating back

condition."  (Pl.'s Br. at 18.)  Plaintiff's argument is so vague and unsubstantiated that it must be

rejected offhand.  Plaintiff's counsel does not cite to any specific pre-onset functional capacity

assessment — let alone a particular finding in one of those assessments — that substantiates his

position.  Instead, in an approach that is all too common among the social security bar, counsel

makes a one-sentence accusation of error, failing to cite the record or any law.[13]  Thus, counsel

dumps in the court's lap the manifold enigma of what counsel means, whether his argument has

---

[13]Another common approach is the one-sentence, unsubstantiated accusation of a failure
to adhere to a general legal principle.  (*See, e.g.*, Pl.'s Br. at 23 ["In any event, the ALJ erred by
failing to make the required findings, *Watkins, id.*"].)  Plaintiff's brief is replete with such
accusations.  (*See id.*, *passim.*)

any legal foundation, and whether the record supports his position.  This is not advocacy.  And this court will not deign to accept counsel's invitation to a snipe hunt.

If counsel believes the ALJ strayed from the law, it is counsel's duty to explain *with precision*: (1) what the ALJ did; and (2) how that act is contrary to social security law.  Counsel does not satisfy that duty by submitting a litany of unsubstantiated, facially conclusory allegations of error.  At the level of removal at which this court reviews an ALJ's decision, one argument that is calibrated and delivered with the precision of a sharpshooter's bullet is far more persuasive than twenty allegations scattered like the buckshot of a bourbon-soaked duck hunter.

Research, careful thought, accurate citation, and attention to detail are not luxuries counsel may jettison when working for the destitute; they are hallmarks of the legal profession.  Counsel's approach to briefing is a disservice to his client.

### c.    *Consideration of Impairments*

Finally, Plaintiff argues that the ALJ erred by failing to include in his hypothetical to the VE "all impairments borne out by the evidentiary record."  (*Id.* at 20.)  Instead of making an argument in support of this contention, Plaintiff offers a numbered list of twelve impairments, each impairment being accompanied by a string of citations to the record.  (*Id.* at 20–21.)

When Plaintiff applied for social security disability benefits, he did not complain of back pain *and* twelve additional impairments.  (*See* Admin. R. at 87.)  Plaintiff merely stated: "I have a bad back[,] lower lumbar[,] have had two back surger[ies]."  (*Id.*)  Additionally, at his first hearing, Plaintiff complained only of back problems.  (*See id.* at 365–81.)  At his second hearing, Plaintiff again complained only of back problems.  (*See id.* at 382–94.)  Poignantly, after the ALJ

posed hypotheticals to the VE in the second hearing, he permitted Plaintiff's counsel to question

the VE.  (*Id.* at 393.)  Counsel did not assert that the ALJ had neglected to include any of the

twelve presently alleged impairments in his hypothetical.  (*Id.*)  Instead, the following exchange

took place:

> ALJ:      Counsel, your witness.
> ATTY:     [W]hat are the handling demands of those jobs, handling, fingering?
> VE:       Cashier is frequent handling, frequent feeling — fingering I'm
>           sorry.  Assembler of small products is the same[,] as is the video
>           rental [clerk].
> ATTY:     No further questions.

(*Id.*)  Accordingly, of the twelve impairments Plaintiff asserts the ALJ neglected to consider, the

court will review only the one relating to Plaintiff's handling capabilities: Plaintiff's wrist ailment.

The ALJ considered Plaintiff's wrist ailment at step two of the sequential evaluation.  (*See

id.* at 15–16.)  The ALJ observed that a wrist injury occurred in 1972 and was treated surgically

in 1974, finding: (1) an absence of a record of treatment subsequent to the surgery; and (2)

Plaintiff performed substantial gainful activity after the surgery.  (*Id.*)  The ALJ did proceed to

note, however, that an "August 1998 x-ray of [Plaintiff's] right wrist showed advance[d] arthritic

changes," which somewhat limited its range of motion.  (*Id.* at 16–17; *see id.* at 229 [August

1998 x-ray].)  Nevertheless, the ALJ emphasized that Plaintiff had "not alleged any difficulties

arising from the impairment and, notably, during his *September 1998* vocational assessment

minimized the effects of his [prior] wrist fracture."  (*Id.* at 17 [emphasis added].)  Thus, the ALJ

determined the wrist ailment did not constitute a "severe" impairment.  (*Id.*)  Plaintiff does not

challenge the determination that the wrist ailment was not severe.  (*See* Pl.'s Br. at 19–21.)

While "the law does not require that [a] plaintiff's mental and emotional impairments be *disabling* to warrant inclusion in the ALJ's hypothetical questions to the VE; it [does require] that they be *severe*, *i.e.*, significantly limit her ability to do basic work activities." *Culler v. Massanari*, 9 F. App'x 839, 843 (10th Cir. 2001) (citing 20 C.F.R. § 404.1520[c]; *Hargis v. Sullivan*, 945 F.2d 1482, 1492 [10th Cir. 1991]; *Evans v. Chater*, 55 F.3d 530, 532 [10th Cir. 1995]) (emphases in original).  Thus, in light of the ALJ's uncontested, well-supported determination that Plaintiff's wrist ailment did not constitute a severe impairment, he did not err in omitting reference thereto in the hypotheticals he posed to the VE.

**4.    Conclusion**

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 2nd day of August, 2007.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge